**Virginia GEER, et al.**

v.

**GENERAL MOTORS CORP.**

**Civ. No. C81–1273.**

United States District Court, N.D. Georgia, Atlanta Division.

June 11, 1984.

---

**3.** Notice of Action dated September 11, 1981, attached as Exhibit C to Respondents' Answer.

Amy Totenberg, Fletcher Farrington, Savannah, Ga., for plaintiffs.

Richard Schneider, King & Spalding, Atlanta, Ga., for defendant.

## ORDER

ORINDA D. EVANS, District Judge.

Following a non-jury trial, this case is before the court for findings of fact and conclusions of law with respect to the individual race discrimination claims of Plaintiffs Virginia Geer and Johnny Winfrey. Mrs. Geer seeks relief under Title VII and 42 U.S.C. § 1981; Mr. Winfrey's claims presently pend only under § 1981.

At all relevant times, both Plaintiffs have worked for Defendant at its Lakewood, Georgia assembly plant.[1] At times most relevant to their respective individual claims, Mrs. Geer was a clerical employee in Lakewood's accounting department; Mr. Winfrey was a supervisor in the plant assigned to the materials department.

Originally, Mrs. Geer, Mr. Winfrey, and another named plaintiff[2] sought to represent a class consisting of "all past, present

---

1. At the time of trial, the plant had been closed temporarily. It reopened in the spring of 1984. The court has no information as to the present employment status of either individual Plaintiff, however.

2. Judgment was entered in Defendant's favor on the individual claim of Anderson Allen pursuant to Rule 41(b), Fed.R.Civ.P. at the close of Plaintiffs' case. Briefly, Mr. Anderson's race discrimination claim arose out of his demotion from cleaning supervisor of a spray paint booth to hourly status in 1974. Evidence adduced during Plaintiffs' case in chief showed that (1) the demotion occurred after an incident which Defendant felt reflected adversely on Mr. Allen's competence as a supervisor, (2) another black employee assumed Mr. Allen's supervisory position and (3) Plaintiffs' witness Charles P. Hand, a former GM employee, stated he thought Mr. Allen was demoted by GM's Fisher Body executives on account of prejudice against GM's Chevrolet employees. Only after being prodded by Plaintiffs' counsel did Mr. Hand opine, albeit grudgingly, that Mr. Allen's race "probably" was the reason for his demotion. Mr. Hand is white, but his testimony as a whole made it clear that he is a partisan of Mr. Allen's. Based on this testimony, the court made findings of fact in Defendant's favor at the close of Plaintiffs' case in chief.

and future black employees who at any time during the applicable statute of limitations have worked in a salaried capacity at the General Motors Lakewood Plant or who have been qualified for promotion to any position above entry salaried level." Plaintiffs' motion to certify the class was denied in an order entered September 23, 1982.

With respect to the individual claims of Mrs. Geer and Mr. Winfrey, the court makes the following findings of fact and conclusions of law:

## A. *Statistical Evidence*

Both sides presented statistical evidence at trial. Plaintiffs contend their evidence supports a finding of race discrimination in promotions at Lakewood during times relevant to the individual claims of Mr. Winfrey and Mrs. Geer. Defendant disputes this. Defendant contends its own statistical evidence shows that Defendant's promotional policies were racially neutral or favored black employees at relevant times. Plaintiffs dispute this. For the reasons discussed hereinafter, the court finds that neither side's expert testimony is helpful in resolving the issues presented herein. Some relevant observations can be made from the raw data utilized by the two statisticians, however.

Dr. Martin M. Shapiro testified on behalf of Plaintiffs. He identified certain charts he had prepared based on information furnished by Defendant during discovery (Plaintiff's Exhibits Nos. 231 through 241, inclusive). He also testified concerning his conclusions based on these exhibits. Basically, Dr. Shapiro's conclusion is that black salaried employees have failed to make appropriate promotional progress at Lakewood during the period from 1974 through 1981. He contends the court should infer

this is due to intentional race discrimination on Defendant's part. The court admitted the documents and Dr. Shapiro's testimony at trial, but with the express reservation that the testimony was being admitted so that the basic data contained in the charts would be available for examination; the court was not necessarily ruling that Dr. Shapiro's opinions could appropriately be drawn from the charts admitted into evidence.

Having considered Dr. Shapiro's testimony as a whole in conjunction with the charts admitted into evidence, the court now rejects his conclusions in their entirety. Specifically, it concludes that his methodology is faulty and that his data does not support an inference of intentional race discrimination in promotions at Lakewood.

Plaintiffs' Exhibits 233 and 234 capsulize Dr. Shapiro's effort insofar as it pertains to promotions of black salaried employees between 1974 and 1981. Exhibit 234 shows the percentage of black representation within each of Lakewood's salary levels (levels 4 through 7) for each of the years 1974 through 1981. Salary level 4 is the lowest level; the levels go up through 8.[3] Plaintiffs' Exhibit 234 shows that in each of the years in question, black representation in the higher salaried levels (6 and 7) is dramatically less than it is in the lower salaried levels (4 and 5). The failure of black representation in the higher salaried levels to approximate that in the lower salaried levels by 1981 is a fact from which Dr. Shapiro concludes Defendant's promotional policies are racially tainted.

General Motors has a promote-from-within policy for salaried employees.[4] Promotions are generally made from one salary level to the next within departments. Therefore it is appropriate to look to the

---

**3.** There are "unclassified" executive positions above salary level 8. Supervisory positions begin at either level 6 or 7, depending on the particular department involved. Salary levels 4 and 5 are not supervisory levels. They appear to involve a range of clerical and semi-professional functions. Further, they are "salaried" levels only in the sense that the company expresses pay as a monthly amount. The court accedes to calling these employees "salaried"

because the parties have consistently done so in this litigation.

**4.** Plaintiffs produced no evidence of the makeup of the hiring pool for level 4. Evidence pertaining to Plaintiffs' individual claims suggests that both hourly-paid workers and off-the-street applicants are represented.

progression of employees from one salary level to another to determine the rate of selection for black employees versus that for white employees. The main problem with Dr. Shapiro's analysis, though, is that he did not consider the existence or absence of actual promotions.[5] His analysis (see especially Plaintiffs' Exhibit 234) assumes, for no apparent reason, that (for example) all employees occupying salary level 5 positions in 1981 were promoted to level 5 in 1981 out of a pool comprised of all who were level 4 and 5 employees in 1981. This assumption is unsupported by the evidence.[6] Obviously, all the incumbents within each salary level each year were not newly promoted that year. Some were incumbents carried forward in the same salary level from the prior year. Thus, it is impossible to know how many of the persons in each category represent a promotional decision in that year. Therefore, the court rejects Dr. Shapiro's conclusion that if Defendant's promotional policies from 1974 to 1981 had been racially neutral, by 1981 the percentage of black representation at higher salaried levels would approximate the percentage of representation at lower salaried levels. This is not an inference which can be drawn from the data. All that may be inferred is that an unspecified number and mix of personnel choices by employer and employees during 1974 through 1981, when superadded to the personnel profile existing as of 1974, yielded the racial profiles shown on Plaintiffs' charts.[7] Thus, change in racial profiles may be viewed, but the extent of change cannot be measured or evaluated against opportunities for change.

The basic data presented by Plaintiffs is informative, however. Between 1974 and 1979, Lakewood's salaried work force increased steadily from 468 persons in 1974 to 610 persons in 1979. Black representation within the salaried work force increased from 5.3% in 1974 to 10.5% in 1979. However, the salaried work force was cut back to 441 employees in 1980 in connection with the extensive reduction in force which occurred at that time. As of 1981, Lakewood had 440 salaried employees; 8.6% of these employees were black.

Therefore, if one looks only at percentage increases, the increase in black representation in Lakewood's salaried work force over time has been meaningful. However, if one looks at absolute numbers—beginning with the very modest numbers of black employees as of 1974 (level 4—six black employees; level 5—nine black employees; level 6—nine black employees; level 7—one black employee) the present representation is not large.

Defendant presented its statistical evidence through Dr. Robert A. Bolda, a General Motors employee. Dr. Bolda identified certain charts he had prepared to illustrate job flow analysis and also to summarize the racial distribution of actual promotions at Lakewood from 1971 through 1982. The upshot of Dr. Bolda's charts (Defendant's Exhibits 59–A through 59–M, inclusive) and related testimony is that when one considers actual promotions from 1971–1982, black employees received a percentage of such promotions greater than their percentage representation in the salaried work force. Specifically, Dr. Bolda testified that between July of 1971 and December of 1982, 9.6% of all promotions in the salaried work force were awarded to black employees. During this time frame, black representation in the salaried work force averaged 7.2%. During the same time frame,

---

5. In addition, the analysis shown on Plaintiffs' Exhibit 234 is not by departments. An analysis of the departments in which the named Plaintiffs actually worked would be more relevant to Plaintiffs' individual claims.

6. It is also tautological. However, the redundant inclusion of level 5 employees makes the percentages more favorable to Defendant than they otherwise would be.

7. The court does not entirely reject the validity of profile analysis, however. If the evidence otherwise suggested frequent job turnover, a year-by-year profile analysis over a period of time could be an helpful item of evidence. Here, however, the evidence suggests a very stable salaried work force, with somewhat limited promotional opportunities during the time frame under consideration.

he testified that black employees received 9.2% of the promotions to level 6, and 6.6% of the promotions to level 7.

The court agrees with the Plaintiffs that Dr. Bolda's analysis is somewhat skewed in Defendant's favor. Primarily, this is because the average length of service of the white salaried employees is so much greater than that of the black salaried employees. As of 1980, all salaried black employees had an average length of service of 10.7 years; all salaried white employees had an average length of service of 18 years. This means that black salaried employees tend to be clustered in seniority and salary ranges where there are more numerous promotional opportunities. Therefore, comparing the promotional experience of all black employees to that of all white employees is not as realistic as comparing groups of employees with comparable seniority.

In addition, Defendant's data base excludes instances of promotions out of the Lakewood plant to another corporate location, *e.g.*, Defendant's home office in Detroit. Defendant's basis for excluding these promotions was that it did not consider that they were made "at Lakewood" by Lakewood supervisors. However, the evidence did show that Lakewood supervisors had considerable input into these decisions. The court finds that they are properly classified as "Lakewood decisions" and that they were improperly omitted from the data base.[8]

In summary, the court finds that the statistical analyses offered by the parties are not helpful in resolving the issues presented. Thus, from the raw data in evidence, the court can draw only these conclusions: (1) since the early 1970's Lakewood has made some progress in integrating its salaried workforce; (2) black representation in the salaried workforce today would be greater if Lakewood had not experienced financial cutbacks.

### B. *Claim of Virginia Geer*

Mrs. Geer has been employed at General Motors Lakewood Plant since August 1968. The portion of her employment experience which is the focus of her claim was in Lakewood's accounting department.[9] She filed a complaint with the EEOC on April 21, 1972, in which she asserted that discriminatory practices in the accounting department had adversely affected blacks in hiring, training, and promotional opportunities. She claimed this discrimination had been continuing since August 1968. The EEOC took no action with respect to the complaint until one of her present attorneys requested on June 8, 1981 that a right-to-sue letter issue. A right-to-sue letter issued on June 24, 1981. The instant lawsuit was filed on July 2, 1981.

At times relevant to the instant litigation, Lakewood's accounting department was a key department for those interested in progressing within General Motors' corporate hierarchy. Between 1968 and 1972, the accounting department contained well in excess of 100 persons. Mrs. Geer was one of the first black persons to work in accounting, which contained only a handful of black employees during the period from August 1968 through 1972.

Within the accounting department there is a recognized hierarchy among the various sections which are relevant to Mrs. Geer's claim. The section generally considered most challenging and prestigious is cost; the next most desirable is audit; then accounts payable; and finally timekeeping. Also, the cost department generally contains more higher paid employees than audit or accounts payable.

Mrs. Geer was one of a number of college graduates who were hired into the accounting department at GM Lakewood in 1968. The others hired at around the same time were five white males: James L. Lev-

---

**8.** It seems doubtful that there were enough of these transfers to impact significantly on Defendant's figures; however, the court is unable to quantify the exact extent of the impact.

**9.** Also referred to by the parties as the finance department.

erett, Jr., W.R. Herren,[10] Richard D. Mercer, Truitt Jackson, and Lynwood Donald. All went into the accounting department at level 4. Mrs. Geer and Mr. Donald were assigned to accounts payable; Messrs. Leverett, Mercer and Herren were assigned to cost; Mr. Jackson was assigned to audit.

Accounts payable is a high-volume paper work section, with responsibility for paying and reconciling accounts with Lakewood's various vendors, some of whom are independent from GM and some of whom are other divisions or related companies within the General Motors corporate structure. Responsibility for paying the various vendors is divided within the department with the relevant divisions being referred to as the "allied desk," the "outside desk," and the "local desk."[11] In some cases, responsibility for each of these desks is again subdivided. For example, one of the persons on the outside desk handles the vendors whose names begin with letters A through G, etc.

Mrs. Geer's first assignment in accounts payable was to the local desk. She received a merit pay increase within level 4 in December 1968, "due to highly satisfactory job performance" (Plaintiffs' Exhibit 205). In the fall of 1969, and again in the fall of 1970, Mrs. Geer received annual performance appraisals indicating that her work was very good. She received "2" performance ratings both times, which under General Motors' standards means "Very good—meets the standards in all important aspects of the job, and in performing some responsibilities exceeds the standards. Performance is considered highly satisfactory." (Plaintiffs' Exhibit 203).

Mrs. Geer took a disability leave of absence from March 21, 1969 through April 28, 1969, during which time she was hospitalized and diagnosed as having gastroenteritis secondary to a "female problem."[12]

Charles Gowing, head of accounts payable, visited her while she was in the hospital.

On June 1, 1969, R.E. Rayfield was moved from the cost section to become head of accounts payable. He reviewed available personnel data on the employees in his new section. On June 23, 1969, Mr. Rayfield placed a memorandum in Mrs. Geer's personnel file, stating in pertinent part the following:

> I informed employee that she had been absent from work 33 and ½ days in the past ten and ½ months. I told her that she must improve her attendance record or I would have to replace her.
>
> She stated that she was sick every day she was absent.
>
> I pointed out to her that she should take care of herself where she would be able to be at work.
>
>  *  *  *  *  *  *
>
> She also asked why she had not been moved off this desk. I informed her before an employee could be moved that the desk must be in current shape.

Mrs. Geer testified that Mr. Rayfield did not orally relate to her the information set forth in the referenced memorandum. Mr. Rayfield testified that he did. The court infers that Mr. Rayfield's oral comments to Mrs. Geer consisted only of a general expression of concern about her absence from the office. Mrs. Geer stated she had been ill, but did not mention the specific nature of her illness or having been in the hospital recently. According to his trial testimony, Mr. Rayfield personally had no information about why Mrs. Geer had been absent other than what she told him; he did not know that she had been on a disability leave of absence.

Mrs. Geer did not know that Mr. Rayfield had placed a memorandum in her personnel file.

---

**10.** Actually, it is not clear that Mr. Herren had graduated from college at this time; relevant personnel file entries are conflicting.

**11.** The allied desk is the position requiring the greatest skill and having the greatest status; next, the outside desk and then the local desk.

**12.** The diagnosis and the duration of the disability were certified by her physician in an insurance form filed in the personnel office on May 30, 1969.

Mr. Rayfield testified that the reason he gave Mrs. Geer a "2" or "very good" performance appraisal rating in the fall of 1969 was that he felt she had cured her attendance problem in response to their discussion in July, 1969 and that she was otherwise a good employee.

Mrs. Geer remained assigned to the local desk in accounts payable until March 1970. She was then transferred to the audit department, where she took a position formerly held by Truitt Jackson. This change did not result in a change in classification level. Mrs. Geer remained at level 4 during the years 1970 through 1973, although her job assignment within the accounting department changed from time to time as will be further explained hereinafter.

In the spring of 1971, the GM Lakewood plant experienced a reduction in force. Less senior employees were let go and others were down graded. Mrs. Geer was "reduced" from the audit department back to accounts payable, where she assumed the duties of the outside desk. She retained her level 4 classification; her pay level was not cut.

Sometime in 1971, Mrs. Geer heard that Messrs Leverett, Herren, Mercer, Jackson and Donald had been reclassified in 1970 to level 5 with concomitant pay raises, although their specific job assignments had not changed. She was concerned about the possibility of discriminatory treatment. She went to see J.W. Benedict, the assistant comptroller.[13] Mr. Benedict confirmed that the other individuals had received reclassification to level 5 and pay raises, without a job change, in 1970. Mr. Benedict stated he had made these decisions based on the recommendation of R.E. Rayfield, who by then was head of the accounting department. According to Mrs. Geer's account of their meeting, Benedict further

indicated that the referenced individuals were "smart boys," giving no further explanation for the differential. She testified that Mr. Benedict made no reference to her absenteeism in the spring of 1969. Mr. Benedict gave no contrary testimony [14]. The court credits Mrs. Geer's recollection of the meeting.

By the fall of 1971 Mrs. Geer had been moved to the allied desk. The responsibilities of that desk were shared with two other employees, Willie Arnold and Paul Chuning. Each had responsibility for reconciling accounts with their vendors on a monthly basis. Based on these reconciliations, payment requests were to be turned in to William Herren by the 20th of each month. Also, each of the employees on the allied desk was responsible for tying down any loose ends remaining on the accounts of the vendors assigned to him or her in time for a consolidated year-end report to be prepared and sent by January 20th. The year-end report for 1971 was especially problematic because of the 1971 Fisher Body/Chevrolet merger.

The sequence of events which immediately led up to the filing of the EEO charge in this case began in December 1971, when Phil Sherwood became Mrs. Geer's immediate supervisor. Before relating the court's findings in that regard, however, some findings of a background nature are helpful.

The court infers from the testimony of both Mrs. Geer and Mr. Sherwood that in the fall of 1971, Mrs. Geer came to feel disaffected and anxious about her employment situation. She felt that the upgrading of the five white males, but not her, to level 5 was a product of discrimination on account of her race and/or sex. Also, she testified at trial, and the court credits her

13. The comptroller is the head of Lakewood's accounting department.

14. The evidence at trial showed that these individuals had received the following performance appraisal ratings during the period preceding their reclassification: Jackson, 3; Leverett, 2,2; Herren, 2; Mercer, 2; Donald, 2. During the same period Mrs. Geer had been rated a "2"

also. Mr. Benedict testified at trial that the reason Mrs. Geer was not reclassified to level 5 was that Mr. Rayfield had not recommended her for a promotion whereas he had recommended the five white males. Mr. Rayfield justified this based on Mrs. Geer's absenteeism in 1969, plus the asserted outstanding performances of the others.

testimony, that some of the employees in accounts payable made racially derogatory comments in her presence. She related an incident in which a fellow black employee, Willie Arnold, was referred to in the presence of Mr. Sherwood and a number of employees as "Willie B."[15] Also, other comments were made outside Mr. Sherwood's presence which were of a racially pejorative nature.

Mrs. Geer's relationship with a number of her co-workers in accounts payable was not particularly good. At trial, Mr. Sherwood attributed this to the fact that although she was the highest paid employee under him in accounts payable, she allegedly was not a very hard worker. He also felt she resented being sent back to accounts payable during the 1971 reduction in force. Mrs. Geer's contention, on the other hand, was that some of her co-workers simply held discriminatory attitudes toward black persons.

From a personality and demeanor standpoint, both Mrs. Geer and Mr. Sherwood are strong-minded, assertive individuals.

Returning to the chronology, on January 19, 1972,[16] Mrs. Geer heard from a fellow employee in accounts payable that Mr. Sherwood was planning to move her to the mail desk.[17] This is an assignment which does not involve an accounting function. Rather, it is basically a clerical job which involves routing paper work within the department. According to Mrs. Geer's source, Mr. Sherwood had informally related the planned change to a group of employees in the department, and had further indicated that he was effecting this change so that the person then assigned to the mail desk, Joyce Collins,[18] could get some additional training in another position. The mail desk traditionally had not been assigned to a college graduate.

The relevation that she was about to be demoted from the highest level to the lowest level position in accounts payable, plus the fact that she had been the topic of office conversation, humiliated and angered Mrs. Geer. In addition, she was already convinced after her interview with Mr. Benedict that she was the victim of discrimination. She was considering what to do when Mr. Sherwood approached her—that same afternoon—and told her she would need to work overtime in order to ensure that the year-end report got out on time. Mr. Sherwood had noticed that there were quite a number of open entries still showing on the allied desk books. His assumption was that some of these open accounts belonged to Mrs. Geer, although he did not specifically know that any of them did. He also wanted Mrs. Geer to be available to help out generally in getting the allied desk accounts in shape, although he did not state this specifically.

Mrs. Geer reacted defensively. She stated to Mr. Sherwood that she had done all of her work and that there was no necessity for her to work overtime.[19] She pointed out that she had worked a considerable amount of overtime during the preceeding months in order to get her desk in order. She showed him the documents she had prepared for the month-end, i.e., January 20, payment. Although Mr. Sherwood had no specific facts relative to the accounts of vendors assigned to Mrs. Geer, he reiterat-

---

15. "Willie B" was the name of a well-known gorilla at the Atlanta Zoo from the 1960's to the '70's.

16. The testimony at trial regarding the events of January 19, 1972 was conflicting. The findings set forth herein resolve those conflicts.

17. This testimony was admitted for the limited purpose of explaining conduct, not for the truth of what the co-worker had heard. See post-trial orders of January 6, 1984 and February 7, 1984. However, the truth of the testimony is suggested by other, independent testimony that Mr. Sher-

wood subsequently did in fact seek to demote Mrs. Geer to Mrs. Collins' lower-ranked position. Putting the two together, the court finds that Mr. Sherwood made the statements attributed to him by Mrs. Geer's co-worker.

18. Mrs. Collins is white.

19. Although Mrs. Geer was considered a salaried employee, her job was not treated as exempt from overtime pay requirements. Therefore, overtime work would have entitled her to additional compensation.

ed his request that she work overtime. She reiterated her statement that she had completed her work. She made no specific statement about the status of her part of the year-end report, however, and did not offer to help in the general effort of the office to get the report out.

Ultimately, Mr. Sherwood backed down. Inasmuch as the area in which all of the accounts payable employees and Mr. Sherwood worked was an open area without partitions, the court infers that the confrontation was viewed and heard by the other employees.

When Mrs. Geer arrived at work on January 20, she sought to retrieve from her file cabinet her documents for the January 20 payment. However, they were not there. After an office search failed to turn up the documents, they had to be reconstructed, with the result that the monthly January payment was sent in late.

Several days later, Paul Chuning found the documents in a file drawer from which they had been missing on January 20.

Mrs. Geer believed that the documents had been hidden by Mr. Sherwood in order to embarrass her.[20] She went to see Charles Fearer, Lakewood's new comptroller, and demanded that he investigate the incident. Mr. Fearer stated that he had already discussed the matter with Mr. Sherwood and that it was closed.

A week after the overtime/missing documents incidents, Mr. Sherwood informed Mrs. Geer that she was going to be reassigned to the mail desk. According to Mrs. Geer's testimony, which is credited by the court, Mr. Sherwood stated he was going to reassign Joyce Collins to the allied desk because Mrs. Collins was bored on the mail desk. He also said he was not going to allow Mrs. Geer to prevent other employees from getting proper training. Mrs. Geer again went to see Mr. Fearer. This time, he interceded; the result was that Mrs. Geer was reassigned to an "outside" desk in accounts payable instead of to the

mail desk, i.e., she received a smaller demotion than she otherwise would have.

After this demotion, Mrs. Geer became bitter. She told Mr. Sherwood she wanted an exact job description so she could be absolutely sure she was doing the job assigned to her, no more and no less. Her relationship with Mr. Sherwood deteriorated. Whether in response to Mr. Sherwood's obvious dislike for Mrs. Geer, or in response to Mrs. Geer's own attitude, her relationship with her co-workers further deteriorated. She felt isolated. She was observed on occasion sitting at her desk with her arms crossed, looking (and being) unhappy and unproductive. One of the group leaders in her section, Mr. Harvey, sent a memorandum to Mr. Fearer noting an incident in which Mrs. Geer had spoken sharply to him in response to a "good morning" greeting. In an emotional meeting with the assistant comptroller, Mr. Benedict, and other management officials, which followed, Mrs. Geer said she felt the other employees were picking on her and talking about her behind her back. She mentioned the racial comments she had heard. Mr. Benedict counselled her not to be unduly sensitive about such matters.

On April 1, 1972, Mr. Sherwood filled out a performance appraisal report on Mrs. Geer. On overall job performance, he gave her a "4" rating. Under General Motors' standards, a "4" rating is defined as "Fair —meets the standards of the job generally, but in the performance of some responsibilities is below desired standards. Performance is considered somewhat marginal." (Defendant's Exhibit 147).

Mr. Sherwood's comment on the appraisal was:

> This employee's overall job performance is marginal due to the fact that her uncooperative attitude toward sharing job responsibilities where required prohibits team work. Her position toward management is unresponsive and in some cases hostile, and she has failed to accept the full responsibilities of the job. She has refused to work overtime when re-

---

**20.** No evidence was produced at trial to substantiate this belief, however.

quested. She has on occasions spent too much time either sitting doing nothing or talking excessively to fellow employees. She has been unresponsive to counseling. While currently a marginal employee, we feel Virginia has the capabilities of being a very satisfactory employee who, with a constructive approach, could develop her full potential.

In April, 1972, Mr. Sherwood informed Mrs. Geer that she was being further demoted from the outside desk to a local desk. Mrs. Geer complained again to Mr. Fearer. She told him that she felt she was being discriminated against both by Mr. Sherwood and by other employees in her department on account of her race. Mr. Fearer told her he was going to back up the supervisor, and that she could either accept the job, or alternatively resign or be discharged. He gave her the next day off "to think about it."

On her day off, Mrs. Geer filed her charge with the EEOC.

For reasons not specifically explained in the record, Mr. Fearer decided that Mrs. Geer should be reappraised.[21] A reappraisal was undertaken by Mr. Sherwood on July 26, 1972. This time, Mrs. Geer received an overall "2" or "highly satisfactory" rating. Mr. Sherwood's comments on the appraisal form are as follows:

This employee has worked hard these last two months. Since she was assigned to a local payer's desk, she has been first to close out her payments, first in closing out month end, and she has worked hard to clear open items on vendors' statements. There has been considerable improvement in Virginia's attitude towards sharing job responsibilities however this is one area for additional improvement. I really feel like Virginia has joined the Accounts Payable Team.

Mr. Sherwood's testimony, which is credited by the court, was to the effect that Mr. Fearer had more or less told him to give Mrs. Geer a better appraisal. In the absence of any specific explanation for why this was done, the court infers simply that Mr. Fearer had some misgivings about the original appraisal.

In August 1972, Mrs. Geer received a merit pay increase which was approved by Mr. Fearer and Mr. Benedict. The form reflecting the increase (Plaintiff's Exhibit 207) states that the merit increase is recommended "based on her very good job performance." On February 1, 1973, Mrs. Geer was transferred out of accounts payable to the cost department. On May 1, 1973, she was reclassified to level 5 within the cost section. The reclassification form indicates that it is "in recognition of a very good job performance and increased job proficiencies." (Plaintiffs' Exhibit 209).

In late 1975, Mrs. Geer was approached by Carol Smith, Lakewood's EEO coordinator. Ms. Smith inquired whether she would be interested in transferring to the personnel department to become a labor relations representative. This would involve representing management in resolving grievances of plant employees. Mrs. Geer told her supervisor Mr. Bednarcik of this inquiry. She asked him what her chances were for further promotions in the accounting department.

Mr. Bednarcik checked with Paul Heminger, who had succeeded Mr. Fearer as comptroller. Mr. Becnarcik then reported to Mrs. Geer that she had no chance for upward mobility within the accounting department.[22]

Although moving to the personnel department offered a lesser chance of long-term advancement, it did offer greater apparent promise of an immediate promotion

---

21. Mr. Fearer could not recall having instructed Mr. Sherwood to reappraise Mrs. Geer. Mr. Sherwood's testimony on this point was emphatic, however.

22. Mr. Heminger testified at trial that Mrs. Geer had a reputation for not being able to get along with people. However, the only specific matter he cited was the related series of events in 1972 with Mr. Sherwood. The evidence also showed that Mr. Sherwood and Mr. Heminger were good friends; in fact, for a period of time, prior to Mr. Heminger's marriage in 1980, they shared an apartment.

and pay raise. Mrs. Geer became a labor representative in training in the personnel department in December 1975. In March 1976 she was promoted to level 6.[23] Mrs. Geer remained a level 6 labor relations representative from that time until the plant closing in 1982. During the period from 1976 through 1978, Mrs. Geer's performance appraisal ratings were "3" or "Good—meets the standards of the job. While some parts of the job may be performed very satisfactorily, these are balanced by weaknesses in others. Performance is considered as generally satisfactory." During the period from 1979 through the date of the 1982 layoff, Mrs. Geer received "2" ratings each year which as previously stated is defined as "very good" or "highly satisfactory."

After Mrs. Geer left the accounting department, a number of promotions were given from fifth to sixth level and then from sixth to seventh level which involved employees who had experience in the accounting department comparable to Mrs. Geer's. In June 1977, Joyce Collins was promoted to sixth level and made a group leader in accounts payable. Six months after that, Mrs. Collins was promoted again to seventh level and became general supervisor of accounts payable. In June 1977 Lanelle Rowe was promoted to a sixth level traveling auditor's position in the accounting department. In 1978, Mrs. Rowe was promoted to a seventh level supervisory position in audit. In 1977 Wanda Ragan was promoted to a sixth level senior accountant position in the cost section. In 1978 she received a promotion to seventh level concurrent with a transfer for temporary duty at General Motors' central office in Detroit.

Based on the foregoing findings of fact pertinent to Mrs. Geer's claim, two basic issues are presented. The first is whether or not Mrs. Geer's supervisor, Mr. Sherwood, discriminated against her on account of her race in the spring of 1972 when he demoted her within the accounts payable department and gave her a low performance appraisal rating. If the answer to this question is in the affirmative, then the second question is whether or not such discriminatory action had any adverse effect on Mrs. Geer's career at Lakewood.

Defendant denies that it discriminated against Mrs. Geer in any respect. It further claims that even if the 1972 actions were discriminatory, that over time the negative impact of the 1972 incidents has totally dissipated.

■ The court finds that Mrs. Geer's difficulties in the spring of 1972 had a definite adverse impact on the course of her career at Lakewood. She got a reputation for being difficult to deal with which for the most part was undeserved. This caused management to channel her away from positions which could lead to executive responsibility within the corporation. Once Mrs. Geer had left the accounting department, she was effectively excluded from consideration for these positions. Further, the court finds that in fact if Mrs. Geer had been fairly considered for either the 1976 or 1977 promotions which were given to Joyce Collins, that she might very well have received them in preference to Mrs. Collins. Mrs. Geer's experience and ability were at least equal to Mrs. Collins', and Mrs. Geer, unlike Mrs. Collins, had been selected by General Motors as a "career pathed" employee who was to be given special consideration in promotions.[24]

---

23. The promotion to level 6 came in response to Mrs. Geer's specific request for the promotion. Her supervisor's reclassification request stated the following: "Virginia Williams is carrying the full load of a Labor Relations Representative. She is able to look objectively at problems and situations which arise in the plant and has earned the confidence and respect of the production organization for the mature judgment

and counsel she renders. In recognition of this performance, a promotion is recommended."

24. On a yearly basis, General Motors selects employees who are believed to have high potential to be "career pathed" employees. A certain percentage of those on the list are, by design, minorities. The 1976 and 1977 lists each contained about 20% minority members.

The closer question, however, is whether any action taken by Defendant in the spring of 1972 was intentional discrimination against Mrs. Geer on account of her race. Neither Title VII nor 42 U.S.C. § 1981 provides protection from treatment that is merely unfair. Rather, the statute provides relief where the unfair treatment is accorded on account of the employee's protected status—in this case race.[25]

The court finds that Mr. Sherwood's decision to demote Mrs. Geer to the mail desk in January of 1972 was motivated by race discrimination. In making this determination, the court applies a variant of the *McDonnell-Douglas* test, *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). It is clear that Mrs. Geer was well qualified for her duties on the allied desk. It is also clear that Mr. Sherwood sought to effectuate her demotion so that a white employee could take the position in her stead. Defendant takes the position that Mr. Sherwood did not decide to demote Mrs. Geer until after—not before—the "overtime" incident wherein Mrs. Geer's attitude was less than laudable. However, the court has found that in fact Mr. Sherwood's decision to demote Mrs. Geer was made before the so-called overtime incident. This leaves no explanation for the planned demotion. Those facts, plus the testimony concerning racial jokes and comments which went uncorrected (at least one of which was made in the presence of Mr. Sherwood) lead to the court to infer that the decision to de-

mote Mrs. Geer was motivated by racial discrimination.

Therefore, Mrs. Geer's inappropriate reaction to Mr. Sherwood's request that she work overtime was caused in large part by her reasonable (and indeed accurate) perception that she was about to be the victim of discrimination. The perception was also furthered by her reasonable (and indeed accurate) belief that she had received less favorable treatment in salary and promotions than the white males who had qualifications, experience and appraisal ratings similar to hers. Thus, Mrs. Geer's subsequent demotion to the "outside" desk and her "4" performance rating in the spring of 1972—which Defendant attributed to her unwillingness to work overtime—in reality were causally linked, in a significant way, to Defendant's own discriminatory acts. Therefore, the demotion and low performance rating in the spring of 1972 were acts of discrimination on account of her race.

Having determined that Mrs. Geer was unlawfully discriminated against, and that such discrimination had a long-term adverse effect on her career, the question now becomes what relief is appropriate. Had the 1972 incidents not occurred, Mrs. Geer likely would not have left the accounting department. She likely would have been promoted to seventh level at the beginning of 1978. Mrs. Geer is hereby awarded backpay equal to the difference between the pay she has actually received and the pay she would have received had

---

**25.** Based on the testimony presented at trial, the court concludes that the placing of a memorandum in Mrs. Geer's personnel file by Mr. Rayfield in June of 1969 was unfair to her. However, it is unable to find, based on the evidence, that this act was motivated by racial animus on Mr. Rayfield's part. Similarly, Defendant's failure to promote Mrs. Geer to level 5 in 1970, while promoting the five white males probably has not been shown to be the product of race discrimination. In each case, Defendant stated as a reason for its action Mrs. Geer's absenteeism in 1969. As to the Rayfield memo, the evidence fails to show that citing absenteeism was merely a pretext on Mr. Rayfield's part for race discrimination. As to the 1970 promotions of the five white males, the evidence shows that the absenteeism was a mere pretext; Mr. Bene-

dict failed to mention absenteeism when confronted by Mrs. Geer concerning her non-promotion. Mr. Benedict's comment that those promoted were "smart boys," however, suggests sex discrimination of which Plaintiff has stated she does not complain. In the final analysis, resolution of this issue is unnecessary. Mrs. Geer has not even shown that the Benedict interview occurred within 180 days of the filing of her EEOC charge in April 1972. Neither is the court persuaded that Mrs. Geer was the victim of continuing discrimination during that time. Therefore, the court is not in a position to give relief for this incident per se. The court has, nonetheless, treated the 1970 non-promotion as an incident of unlawful discrimination in the context of its analysis of the Sherwood overtime incident.

this promotion been effected on January 1, 1978. Counsel shall confer and provide the court with their mutual or respective positions regarding the appropriate amount of backpay to be awarded. In addition, counsel shall inform the court of Mrs. Geer's present employment status and of their respective positions regarding what further equitable or monetary relief is appropriate in light of that status. Finally, Mrs. Geer is hereby awarded her reasonable attorneys' fees.

The requested information shall be filed within twenty (20) days of date of entry of this order.

### C. *Claim of Johnny Winfrey*

Plaintiff Johnny Winfrey has been employed at General Motors Lakewood Plant since July 19, 1965. He was originally an hourly paid plant worker; beginning in 1967 he was promoted to a level 6 supervisory position as foreman in the materials department. Mr. Winfrey held this position more or less continuously from 1967 until 1980.[26]

The focus of Mr. Winfrey's complaint herein is his reduction to hourly status in April 1980. At that time, Lakewood lost its truck production. About ⅓ of its total work force was laid off; significant numbers of retained employees were demoted.

The 1980 layoffs and demotions were basically, but not entirely, on the basis of length of service[27] within job classifications. An employee whose performance appraisal rating was at least two levels higher than that of a more senior employee was kept in preference to the more senior employee. However, there were few actual applications of the "two level difference" rule.[28] Also, Defendant permitted employees to transfer across job classifications to displace or "bump" a less senior employee, but only where the transferring employee could learn the displacee's job with a minimum of training.

In March 1980, Mr. Winfrey learned he would be reduced from a level 6 supervisory position in the materials department to an hourly paid position as an assembler in the body shop. Mr. Winfrey had the least seniority of any of the twenty foremen (job classification No. 6M12) in the materials department.[29] He told supervisor Mr. Windsor that he should be allowed to displace Ronald Dickerson, a deckman (job classification No. 6M00) in the materials department. Mr. Dickerson had about ten months' less seniority than Mr. Winfrey. Alternatively, Mr. Winfrey wanted to displace William Yates, a supervisor (job classification No. 6M08) in the Paint Department. Mr. Yates had eight months' less seniority than Mr. Winfrey.

Mr. Windsor consulted with the plant manager and other upper level personnel concerning Mr. Winfrey's request. They decided he could not learn the job of either Mr. Dickerson or Mr. Yates with minimal training. On April 1, 1980, Mr. Winfrey was demoted to the hourly paid position where he remained until the plant closed in 1982.

Mr. Winfrey filed his charge with the EEOC in April 1980. The text of the charge, in its entirety, was as follows:

I. I was demoted from Supervisor (Level 6) to an hourly status. There were approximately one hundred demotions. The majority of the individuals demoted were Black males.

II. I was informed by Don Youngblood, Superintendent, that I was being demoted because of length of service.

---

26. During a temporary reduction in force which occurred in 1974–75, Mr. Winfrey was reduced to an hourly position. He resumed supervisory status on January 16, 1976.

27. Length of service means the employee's entire service, not just salaried service.

28. No specific applications were pointed out at trial.

29. One foreman in job classification 6M12, Fred Goodlett, had less seniority than Mr. Winfrey. Mr. Goodlett, who is black, was transferred to Defendant's Doraville, Georgia plant in March 1980. Therefore, Mr. Goodlett technically was not included in the April 1980 reduction in force.

III. I believe that I was demoted because of my race (Black) for the following reasons:

A. Length of service was used, and for this reason, I was immediately removed from Supervision.

B. I was told that I was being considered for other positions; however, I did not receive any other management position.

C. Moreover, I was told that I could not function in a Clerk position (Level 5) because I had never worked in that capacity.

The EEOC issued a right to sue letter, with determination of no reasonable cause, on May 2, 1980. However, the instant suit was not filed until July 2, 1981. Therefore, any claim for relief under Title VII is now time-barred.[30] 42 U.S.C. § 2000e–5(f)(1). For this reason, Mr. Winfrey's Title VII claims were dismissed by the court at the conclusion of Plaintiff's evidence at trial.

Mr. Winfrey's race discrimination claims under 42 U.S.C. § 1981 are now before the court for determination. These claims include those set forth in the EEOC charge, plus others. Thus, the claims asserted are: (1) that reducing Mr. Winfrey to hourly status based on seniority constituted intentional race discrimination because Defendant knew such criterion would adversely affect black employees than white employees; (2) that Defendant's refusal to let Mr. Winfrey displace Ronald Dickerson or William Yates, white employees, during the 1980 reduction in force was intentional race discrimination; (3) that transferring white employee Stanley Carter in January 1980 from a fifth level material department clerk position to a fifth level insurance clerk position in personnel instead of Mr. Winfrey was intentional race discrimination; (4) that transferring white employee Billy Knight to a sixth level supervisory job in quality control, instead of Mr. Winfrey, in July of 1979 was intentional race discrimination. With respect to claims Nos. (3) and (4), Mr. Winfrey does not claim that he sought these positions in 1979 and 1980; there is no evidence he was considered for them. He reasons, with the benefit of knowledge gained from pretrial discovery, that if he had received the subject transfers instead of Carter and Knight, that he would have retained a sixth level supervisory position in 1980 as they did instead of being reduced to hourly status.

■ Each of Mr. Winfrey's claims will now be considered in turn. First, the court rejects his claim that utilization of seniority as the primary criterion for the 1980 reduction in force constituted intentional race discrimination. Defendant's explanation that length of service is a layoff/reduction criterion which employees find acceptable

---

**30.** At trial the court rejected Mr. Winfrey's argument that filing suit within 90 days of receipt of his right-to-sue letter was unnecessary under a tolling theory. Throughout 1980, a motion for class certification was pending in *Johnson v. General Motors,* No. C76–1204A (N.D.Ga.) a case involving alleged race discrimination at the Lakewood General Motors plant. Class certification was denied in an order entered December 16, 1980. On January 16, 1981, a group of individual Lakewood employees filed a motion for further relief in *Rowe v. General Motors Corporation,* a class action involving race discrimination at Lakewood, in which a final decree was entered in 1972. *See Rowe,* 457 F.2d 348 (5th Cir.1972). The court's ruling on the motion for further relief was entered April 30, 1982. 550 F.Supp. 204 (N.D.Ga.1982). Winfrey claims that under the holding of *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), the time for filing suit herein was tolled between the date of receipt of

the right-to-sue letter (May 1, 1980) and the date the instant suit was filed—July 2, 1981. Thus, he argues that the lapse of more than 90 days between the date of his receipt of the right-to-sue letter and the filing of the instant law suit is not fatal to his claim.

The complaint in *Johnson* describes a very broad class. Therefore, the court accepts Mr. Winfrey's argument that until the motion for class certification was denied in *Johnson* on December 16, 1980, the period of limitations was tolled as to Mr. Winfrey's individual claims. However, the court finds no operative tolling thereafter. A specific description of Mr. Winfrey's individual claim filed in the *Rowe* suit in April 1981 addresses only complaints relative to the 1973–74 layoffs. This description of Mr. Winfrey's claim was filed by the same counsel who represent him in the instant litigation, and who represented Plaintiff in *Johnson v. General Motors.*

because it is impersonal and objective is, on its face, legitimate and plausible. The record provides no basis for finding that the seniority criterion was merely a ruse for race discrimination. Secondly, since Mr. Winfrey's Title VII claim is not now pending, there is no occasion to consider whether the so-called disparate impact test should be employed to test the validity of the 1980 reduction in force procedures, or whether Defendant's system constituted a "bona fide seniority system" within the meaning of § 703(h) to Title VII. 42 U.S.C. § 2000e–2(h). *Cf. Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

Next the court considers Mr. Winfrey's claim that Defendant's refusal to let him displace either Mr. Dickerson or Mr. Yates, white supervisory employees, in the 1980 reduction was motivated by race discrimination.

The court begins by finding that Mr. Winfrey made out a prima facie case on both the Dickerson and the Yates claims. Mr. Winfrey had more seniority than either of these white employees. Further, he introduced some evidence from which the court could infer that he was qualified to perform Mr. Dickerson's job as a deckman in the materials department and Mr. Yates' job as a paint supervisor in the paint department; namely, that in 1966–67, Mr. Winfrey had had several months' experience performing each of these jobs as a part of his overall supervisory training.

Defendant stated a legitimate, non-discriminatory reason for refusing to allow Mr. Winfrey to displace either Mr. Dickerson or Mr. Yates: that he could not learn their jobs with "a minimum of training" pursuant to Defendant's 1980 reduction in force guidelines. Defendant explained its reason for such requirement: a time of massive contraction in the work force is not a good time to retrain employees.

Thus, resolution of these claims boils down to a determination whether Defendant's stated reason in either case was pre-textual. As to both claims, the court finds the evidence does not preponderate in Mr. Winfrey's favor on this issue.

The evidence showed that although Mr. Winfrey and Mr. Dickerson were both sixth level supervisory employees in the materials department, their jobs were quite different. Mr. Winfrey was a "line" supervisor of hourly paid employees. Mr. Winfrey's crew would uncrate fabricated component parts, *e.g.,* fenders or steering wheels as they arrived at the Lakewood plant. Subsequently, they would physically distribute the parts to the appropriate storage area in the plant. The deckmen such as Mr. Dickerson, on the other hand, performed a clerical function. They would monitor and regulate the supply of materials to various segments of the assembly line so it could operate continuously. The deckmen would check with floor supervisors, and also stay apprised of arrival times of shipments. In about 1975, the deckmen began using computers. The court finds credible the testimony of Mr. Winfrey's supervisors that it likely would have taken several months for him to be able to perform the deckmen's job satisfactorily.

The evidence is less clear regarding Mr. Winfrey's claim that he should have been permitted to displace Mr. Yates, a sixth level paint supervisor in the paint department. Mr. Winfrey's evidence did not address in any particularized way exactly what the duties of the paint supervisor entail. The court envisions that a paint supervisor would supervise hourly paid workers who spray paint on the vehicles. It assumes that such a supervisor would exercise a quality control function in overseeing and inspecting the employees' work. According to Defendant's witnesses, the type of paint used in 1980 was a different, more complex type from that used in 1966–67 when Mr. Winfrey received his paint training. However, Defendant's witnesses did not explain how such complexity impacts on the work of a paint supervisor. Mr. Winfrey's evidence on the other hand

was basically to the effect that he felt sure he could do the job. The court finds that the evidence on the issue of pretext does not preponderate in Mr. Winfrey's favor.

Finally, the court considers Mr. Winfrey's claims that he should have received transfers to certain positions in 1979 and 1980 which were given instead to white employees Billy Knight and Stanley Carter, respectively. Mr. Winfrey's rationale is that had he received such transfers, he would have been protected against demotion to hourly status in the 1980 reduction in force. The evidence showed that in the 1980 reduction, neither Mr. Knight nor Mr. Carter were reduced to hourly status.

Mr. Winfrey failed to make out a prima facie case with respect to the Knight or Carter positions. The evidence showed that Mr. Winfrey did not seek either of these positions and that he was not considered for them. Therefore, there is no prima facie showing of intentional discrimination on Defendant's part to deny the positions to him.[31]

In accordance with the foregoing, Defendant is entitled to judgment with respect to Mr. Winfrey's claims under 42 U.S.C. § 1981.

### D. Conclusion

In accordance with the foregoing, Plaintiff Virginia Geer shall have judgment of Defendant in accordance with this order; Defendant General Motors Corp. shall have judgment in its favor with respect to the claims of Plaintiff Johnny Winfrey and Plaintiff Anderson Allen. Plaintiffs shall bear two-thirds of the costs; Defendant one-third. The Clerk is hereby DIRECTED to withhold entry of final judgment until further express direction by the court.

---

31. The court notes that Defendant, a large corporate employer, does not post job openings for salaried positions. Positions are filled based on management recommendations and a word-of-mouth system. In this situation, the court might very well permit Plaintiff to make out a prima facie case with respect to a position for which he was not actually considered, if Plaintiff shows convincing statistical proof, evidence of qualification for the position, and evidence that he would have been interested in the job opening had he known about it. Here relevant statistical proof is missing.